

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WILLIAM BLAIR & COMPANY, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09 C 3564 |
| v. ) | |
| ) | Honorable Charles R. Norgle |
| ALLIED RICHARD BERTRAM MARINE ) | |
| GROUP, INC.; ALLIED MARINE GROUP, ) | |
| INC.; ARB REALTY, INC.; BYC, INC.; and ) | |
| RICHARD BERTRAM YACHTS, INC., ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court is Plaintiff William Blair & Company, LLC's ("Blair") motion for partial summary judgment. Also before the Court is a cross-motion for summary judgment filed by Defendants Allied Richard Bertram Marine Group, Inc. ("ARBMG"), Allied Marine Group, Inc. ("AMG"), ARB Realty, Inc. ("ARB"), BYC Inc. ("BYC") and Richard Bertram Yachts, Inc.'s ("RBY") (collectively "Defendants"). For the following reasons, both motions are denied.

## I. BACKGROUND

### A. Facts[1]

Blair is an investment firm that offers asset management services to its clients. In 2007, RBY and AMG were in the business of selling and servicing yachts and sport-fishing boats in Florida. At all times relevant to this action, ARBMG owned 100% of the stock of RBY and 96% of the stock of AMG. ARBMG, however, did not have any direct ownership interest in BYC or ARB. According to Defendants, BYC and ARB were not in the yacht-selling business, but

---

[1] Unless otherwise attributed, the Court takes all facts presented in this Opinion from the parties' Local Rule 56.1(a)(3) and 56.1(b)(3) Statements and Responses and notes the disputed facts within.

rather only owned real estate. Blair acknowledges that BYC and ARB's "most significant assets were real estate," Pl.'s Local Rule 56.1(b)(3)(c) St., ¶ 4, but contends that all Defendants "were in the boat business together." Id., ¶ 1 (quotations omitted); see also Pl.'s Local Rule 56.1(a)(3) St., ¶ 5 (stating that ARBMG operated a business of selling, brokering, and servicing premium yachts and sport-fishing vessels through its subsidiaries and affiliates). All parties agree that in late 2007, Defendants' owners decided to "get out of the boat business completely and to sell the entire boat sales and servicing business, including all of the businesses' boat inventory." Defs.' Local Rule 56.1(a)(3) St., ¶ 6. ARBMG engaged Blair's services to assist with this process.

### 1. The Engagement Letter

On November 12, 2007, Blair and ARBMG entered into a written agreement (the "Engagement Letter") whereby Blair agreed to:

> [R]ender certain investment banking services in connection with a possible business combination of [ARBMG] with another party (through tender offer, merger, sale, exchange or otherwise of 50% or more of the outstanding capital stock of the Company) or sale of all or substantially all of the Company's assets in each case in either a single transaction or a series of transactions (each, a 'Possible Transaction').

Am. Compl., Ex. A at 1. The phrase "all or substantially all of the Company's assets" was not defined in the Engagement Letter. The Engagement Letter indicated that Blair would assist ARBMG's management in "developing a strategy for pursuing a Possible Transaction involving [ARBMG] and a list of possible participants in the Possible Transaction" and "contacting and eliciting interest from those possible participants expressly approved by [ARBMG]." Id.

In return, ARBMG agreed to pay Blair "$50,000 upon the mutual execution of th[e] Agreement and a monthly fee in the amount of $25,000 payable in advance in full on the 15th day of December and each calendar month through and including March 2008." Id. at 2-3. In the event that a "Possible Transaction" was consummated, ARBMG was to pay Blair "a fee (the

'Transaction Fee') equal to the greater of $500,000 and 10% (ten percent) of the Transaction Consideration . . . ." Id. at 3. The Engagement Letter defined "Transaction Consideration" as follows:

> [T]he total amount of cash and the fair market value of all securities or other property paid or payable directly or indirectly to [ARBMG] (including its direct or indirect affiliates) or any of its or their security holders in connection with a Possible Transaction which is consummated, including without limitation, (i) amounts paid (A) pursuant to covenants not to compete, employment contracts (substantially in excess of current annual compensation amounts), employee benefit plans (substantially in excess of current benefit amounts) or other similar arrangements (B) to holders of any warrants or convertible securities of [ARBMG] and (C) to holders of any options or stock appreciation rights issued by [ARBMG], whether or not vested; and (ii) in the case of a sale of substantially all [ARBMG's] assets, the total consideration paid for such assets plus the net value of any current assets not sold by [ARBMG]. For illustration purposes only, in the event that enterprise value is $68,239,000 and indebtedness (including floor plan financing or similar non-insider liabilities) is $60,739,000, then the Transaction Fee payable to Blair is equal to $750,000 (e.g., 10% of $7,500,000).

Id. In addition, pursuant to the Engagement Letter, ARBMG would "reimburse Blair for all out-of-pocket expenses (including reasonable fees and expenses of its counsel and any other independent experts retained by Blair upon prior written consent of [ARBMG]) reasonably incurred by it in connection with its engagement hereunder." Id. at 4.

As to ARBMG's affiliates and subsidiaries, the Engagement Letter stated:

> If all or any portion of the business of [ARBMG] or any possible participant is engaged in through subsidiaries or other affiliates, the references in this letter agreement to [ARBMG] or the possible participant will, when appropriate, be deemed also to include such subsidiaries or other affiliates.

Id. at 2.

### 2. The Asset Purchase Agreement

Approximately one month after the signing of the Engagement Letter, Blair and ARBMG representatives had a meeting with Ferretti, S.p.A ("Ferretti") and Ferretti's private equity stockholder Candover Group concerning Ferretti's possible purchase of Defendants' assets.

Blair continued to assist with negotiations with Ferretti until July 29, 2008, when ARB, BYC, RBY and AMG entered into an Asset Purchase Agreement ("APA") with Ferretti. The APA identified ARB, BYC, RBY and AMG as the "Sellers" and Ferretti as the "Purchaser." Am. Compl., Ex. B at 1. The APA states that:

> Sellers and their respective Affiliates are engaged in the business of selling Bertram Yachts (the 'Reselling Business') and servicing boats (the 'Servicing Business' and, together with the Reselling Business, the 'Business') from nine locations in the State of Florida . . . [and] each Seller wishes to sell and dispose of, and Purchaser wishes to purchase and assume, certain assets and liabilities relating to the Business on the terms and subject to the conditions set forth in this Agreement.

Id. According to Defendants, AMG and RBY were also in the business of selling boats other than Bertram Yachts. Defendants claim that at the time of the APA only ten of AMG and RBY's fifty-nine boats in inventory were Bertram Yachts.

Section 2.1 of the APA provides that:

> Sellers shall sell . . ., and Purchaser will purchase from Sellers, good and valid title, . . . to all of the assets, properties and rights of Sellers and their Affiliates that are now, or at the time of the Closing will be, used or held for use in the conduct of, the Business, including all assets reflected on the Balance Sheet and not subsequently disposed in the ordinary course of business . . . other than the Excluded Assets described in Section 2.2.

Id. at 9. Section 2.1 of the APA then details an extensive list of assets that ARB, BYC, RBY and AMG were selling to Ferretti including, but not limited to, all Owned Real Property and all Leased Real Property, all Tangible Property, certain Inventory, all trade accounts receivable and all Business Intellectual Property. In Section 2.2, however, the APA identifies a list of "Excluded Assets" which Ferretti would not be acquiring. Among the Excluded Assets are the "Excluded Boats," defined as "all boats owned by Sellers at any time that are not part of the Bertram Inventory." Id. at 3. The Bertram Inventory is defined as "Sellers' new boat inventory of Bertram Yachts as set forth in Schedule 1.1(a) . . . ." Id. at 1. Schedule 1.1(a) lists ten boats –

4

five attributed to AMG and five attributed to RBY – with a combined "total inventory cost" of $22,140,198.52.

Section 3.12 further explains that "[t]he Assets constitute all of the assets, properties and rights used in or necessary for the conduct of the Business as heretofore conducted by Sellers (except for the Excluded Assets) and are adequate to conduct the Business as presently conducted." Id. at 21. Section 3.12 also states that:

> Immediately following the Closing, none of Sellers or any of their respective Affiliates will own or lease any assets, properties or rights that are used in or are necessary for the conduct of the Business as presently conducted. There are no material facilities, services, assets or properties that are used by any of Sellers in the conduct or operation of the Business that are not required to be transferred to Purchaser pursuant to the provisions of this Agreement (other than the Excluded Assets).

Id.

With respect to fees, in Section 3.25 of the APA the Sellers and Ferretti agreed that "[n]o agent . . . is entitled to any . . . fee or commission . . ., other than William Blair LLC, whose fees and expenses will be paid by Seller pursuant to an engagement letter dated, November 12, 2007 . . . ." Id. at 25.

Section 5.7 directed that:

> From the Closing and for three years thereafter, none of Sellers will, and each of them will cause their respective Affiliates not to, directly or indirectly anywhere in the State of Florida . . . solicit, sell or attempt to sell goods and services offered by the Business to any person that is a customer of the Business . . .; *provided, however,* that notwithstanding the foregoing . . . (2) Sellers and their respective Affiliates shall be permitted to take all actions and do all such things as may be necessary to attempt to sell and sell the Excluded Boats and (3) Sellers and their respective Affiliates shall be permitted to operate a boat brokerage business in the State of Florida to the extent it has obtained Purchaser's prior written consent to conduct such business . . . .

Id. at 31.

According to Defendants, after the execution of the APA, ARBMG continued to sell boats manufactured by companies other than Bertram Yachts and "also retained employees and independent brokers, leased new premises, secured dock space, and paid other operating expenses . . . ." Defs.' Local Rule 56.1(a)(3) St., ¶ 24. Blair claims, though, that "after the [APA] defendants were no longer entitled to conduct the business of selling boats and possessed the right only to liquidate the Excluded Boats." Pl.'s Local Rule 56.1(b)(3)(c) St., ¶ 24.

### 3. Value of Defendants' Assets

Defendants assert that Ferretti paid a total of $49,604,570 for ARB, BYC, RBY and AMG's assets. More specifically, Defendants claim that Ferretti paid AMG and RBY $34,904,570 for AMG and RBY's real estate, ten Bertram boats, parts, and unidentified other assets and $14,700,000 for ARB and BYC's real estate assets. Blair states that it "does not possess specific financial data concerning the [Ferretti] transaction to admit or deny the specific sums involved . . . ." Pl.'s Local Rule 56.1(b)(3)(c) St., ¶ 19.

Defendants aver that AMG and RBY's inventory, purportedly consisting of fifty-nine boats as well as an unidentified amount of boat parts, was originally purchased for approximately $55,000,000, but AMG and RBY "had floor plan and other financing liabilities of approximately $53,600,000." Defs.' Local Rule 56.1(a)(3) St., ¶ 3. By April 8, 2008, Defendants' floor plan liability had increased to $61,322,450.00. Defendants do not provide any indication as to when the boats and boat parts were purchased. Blair again notes that it does not possess sufficient financial data to admit or deny Defendants' claims as to the cost of AMG and RBY's inventory.

According to Defendants, the ten Bertram boats Ferretti purchased pursuant to the APA were previously purchased for $22,141,199. The remaining forty-nine non-Bertram boats, which Defendants contend remained in the possession of AMG and RBY after the execution of the

APA, were originally purchased for $32,676,000.[2] Defendants also claim that after the APA, AMG and RBY remained in possession of unidentified assets that originally cost AMG and RBY $5,708,112. Defendants state, though, that they are unable to determine the fair market value of the forty-nine boats and unidentified assets until the assets are liquidated. Blair, in turn, "denies that defendants cannot know the fair market value of the liquidation inventory until sold, as defendants were previously in the boat brokerage and sales business, have allegedly retained brokers and sold certain of the Excluded Boats since the Closing . . . ." Pl.'s Local Rule 56.1(b)(3)(c) St., ¶ 20. Blair, however, does not offer any estimate as to the fair market value of the forty-nine non-Bertram boats.

### 4. Blair's Fees

Blair acknowledges that, pursuant to the Engagement Letter, it has already been paid $157,500 in interim payments. In August 2008, however, Blair requested that ARBMG pay Blair a $1,962,000 "Transaction Fee" based on the APA. As of the present date, ARBMG has refused to pay Blair any Transaction Fee.

## B. Procedural History

Blair filed the present action on June 12, 2009, alleging that this Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Blair's two-count complaint brought claims for breach of contract and unjust enrichment against Defendants. On August 4, 2009, Blair filed an amended complaint in an attempt to cure certain defects in the original complaint's jurisdictional pleadings. The amended complaint also contains claims for breach of contract and unjust enrichment. Defendants answered the amended complaint on August 17, 2009. Prior to engaging in discovery, Blair filed a motion for partial summary judgment on October 13, 2009.

---

[2] Defendants do not indicate what percentage of Defendants' financing liabilities was attributable to the forty-nine non-Bertram boats. Blair contends that as of April 8, 2008, Defendants had floor plan liability for the non-Bertram boats in the amount of $37,583,738.00, which Defendants deny.

7

On November 20, 2009, Defendants filed their own motion for summary judgment. On April 2, 2010, Blair filed a supplement to its motion that establishes that the Court does indeed possess diversity jurisdiction over this action. Both parties' motions are now fully briefed and before the Court.

## II. DISCUSSION

### A. Standard of Decision

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). In deciding a motion for summary judgment, the court "view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in the nonmoving party's favor." See AA Sales & Assocs., Inc. v. Coni-Seal, Inc., 550 F.3d 605, 609 (7th Cir. 2008). The nonmoving party cannot rest on the pleadings alone, however, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show that a genuine triable issue of material fact exists. See Szymanski v. Rite-Way Lawn Maint. Co., 231 F.3d 360, 364 (7th Cir. 2000). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hosp. & Med. Ctr., 328 F.3d 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888-89 (1990)). Summary judgment is not appropriate though if the court must make a choice of inferences from the available evidence. See U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also Spiegla v. Hull, 371 F.3d 928, 935 (7th Cir. 2004).

### B. Analysis

#### 1. Blair's Motion for Summary Judgment

Blair argues that partial summary judgment is appropriate in the present case because there is no question of material fact as to ARBMG's breach of the Engagement Agreement. Under Illinois law, a breach of contract claim has four separate elements: "'(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" Reger Dev., LLC v. Nat'l City Bank, 592 F.3d 759, 764 (7th Cir. 2010) (quoting W.W. Vincent & Co. v. First Colony Life Ins. Co., 814 N.E. 2d 960, 967 (Ill. App. Ct. 2004)). The parties do not dispute that the Engagement Letter is a valid and enforceable contract. Defendants, however, contend that there was no substantial performance by Blair under the Engagement Letter because the condition precedent to Blair's receipt of its Transaction Fee – the "sale of all or substantially all of [ARBMG's] assets" – did not occur.

In an attempt to demonstrate that all or substantially all of ARBMG's assets were sold as a result of the APA, Blair first directs the Court to Section 3.12 of the APA. Section 3.12, titled "Entire Business; Sufficiency of Assets," states in pertinent part that "[t]here are no material facilities, services, assets or properties that are used by any of Sellers in the conduct or operation of the Business that are not required to be transferred to Purchaser pursuant to the provisions of this Agreement (other than the Excluded Assets)." Blair suggests that the "Entire Business" title, in conjunction with the broad language of 3.12, establishes conclusively that ARBMG sold all its assets to Ferretti upon execution of the APA.

Importantly, however, Section 3.12 specifically identifies certain "Excluded Assets," namely the non-Bertram boats, that would not be transferred to Ferretti pursuant to the APA. Thus, at the least, Section 3.12 makes clear that the APA did not result in the sale of *all* ARBMG's assets. Blair argues that the exclusion of some of Defendants' boats from the APA "does not [necessarily] mean that substantially all of the assets of the business were not sold."

Pl.'s Mem. at 8-9 (quotations omitted). This is true, but in order for the Court to grant summary judgment, Blair must do more than establish that it is possible that ARBMG sold substantially all of its assets to Ferretti. See Spiegla, 371 F.3d at 935 ("Summary judgment is inappropriate when alternate inferences can be drawn from the available evidence."). Section 3.12, on its own, does not preclude the possibility that the APA failed to result in the satisfaction of the condition precedent necessary for Blair to receive its Transaction Fee. Therefore, Blair's reliance on Section 3.12 as a basis for summary judgment is unfounded.

Blair next argues that Defendants "flat out admi[tted] that a fee is due and owing Blair in Section 3.25 of the APA . . . ." Pl.'s Mem. at 8. Section 3.25 states in relevant part that "[n]o agent . . . is entitled to any . . . fee or commission . . ., other than William Blair LLC, whose fees and expenses will be paid by Seller pursuant to an engagement letter dated, November 12, 2007." According to Blair, because "Blair had received its retainer fee and monthly service fees through March, 2008" and "[t]he only fee possible [sic] due Blair in July 2008 when the APA was executed was the Transaction Fee," Pl.'s Reply at 3, Section 3.25 is an explicit acknowledgement by Defendants that Blair was entitled to the Transaction Fee.

The term "Transaction Fee," however, is not mentioned anywhere in Section 3.25. Notably, the Engagement Letter referenced in Section 3.25 contemplates at least two "fees" or "expenses" other than the Transaction Fee. See, e.g., Engagement Letter at 4 ("[ARBMG] will reimburse Blair for all out-of-pocket expenses (including reasonable fees and expenses of its counsel and any other independent experts retained by Blair upon prior written consent of [ARBMG]) reasonably incurred by it in connection with its engagement hereunder."). Blair fails to put forth any argument as to why Section 3.25 could not be making reference to Blair's counsel's fees and expenses as opposed to its Transaction Fee. Thus, Section 3.25's general

language as to fees and expenses belies Blair's assertion that the term constitutes an admission that the Transaction Fee is due and owing. As a result, Section 3.25 does not eliminate all questions of material fact as to Defendants' liability under the Engagement Letter.

Blair also suggests that Illinois case law requires a finding that ARBMG sold substantially all of its assets to Ferretti. Blair cites to Stiles v. Aluminum Prods. Co., where the court held that an aluminum and stainless steel cooking utensil manufacturer sold substantially all of its assets to another corporation even though it retained assets valued at $760,622.69 and only received $1,406,570 as a result of the sale. 86 N.E.2d 887, 888 (Ill. App. Ct. 1949). In Stiles, however, the parties stipulated to the value of the unsold assets. Id. Here, neither party has attempted to estimate the fair market value of the retained boats. Blair claims that "you can be certain that the retained inventory of 49 non-Bertram boats, which Defendants say cost $32,676,000 had little equity value," Pl.'s Reply Mem. at 6, but provides no citation for this assertion. And even Blair concedes that there is a "dispute outstanding [as to] the 'net value of the current assets' retained." Id. at 7. Therefore, although it certainly seems possible that the APA did in fact result in the sale of substantially all of ARBMG's assets, absent the valuation figures present in Stiles, a question of fact remains as to whether Blair satisfied the condition precedent set forth in the Engagement Letter. After the parties complete discovery and additional facts become part of the record, summary judgment may very well be appropriate. Given the present record, however, Stiles does not control the outcome of this action and Blair's motion for partial summary judgment is denied.

## 2. Defendants' Motion for Summary Judgment

Defendants seek summary judgment as to both Blair's breach of contract and unjust enrichment claims. With respect to Blair's breach of contract claim, the Court must deny

11

Defendants' motion based on the above-described questions of material fact concerning the value of Defendants' retained inventory. As to Blair's unjust enrichment claim, Defendants are correct that under Illinois law, "'where there is a specific contract that governs the relationship of the parties,' a plaintiff cannot assert a claim for unjust enrichment." Omnicare, Inc. v. UnitedHealth Group, Inc., 594 F. Supp. 2d 945, 980-81 (N.D. Ill. 2009) (quoting Stathis v. Geldermann, Inc., 692 N.E.2d 798, 812 (Ill. App. Ct. 1998)). However, Defendants currently dispute that the Engagement Letter governs the relationship between Blair and AMG, ARB, BYC and RBY. See Defs.' Answer (stating as an affirmative defense that Blair's claims against AMG, ARB, BYC and RBY "are barred, in whole or in part, due to lack of privity"). Moreover, both parties' motions only discuss in passing the applicability of the Engagement Letter to all Defendants. Thus, the Court finds it premature to definitively state the scope of the Engagement Letter. Accordingly, Defendants' motion for summary judgment is denied.

## III. CONCLUSION

For the foregoing reasons, Blair's motion for partial summary judgment and Defendants' motion for summary judgment are both denied.

IT IS SO ORDERED.                ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATED: April 7, 2010